IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| NIAGARA BOTTLING, LLC<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>CC1 LIMITED PARTNERSHIP D/B/A/ COCA-COLA PUERTO RICO BOTTLERS<br><br>　　　Defendant. | CIVIL NO.: 1:18-cv-<br><br>Re: TRADEMARK INFRINGEMENT; UNFAIR COMPETITION; BREACH OF CONTRACT; DAMAGES<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**TO THE HONORABLE COURT:**

Plaintiff, Niagara Bottling, LLC ("Niagara"), through its undersigned counsel, complains and alleges against defendant, CC1 Limited Partnership d/b/a Coca-Cola Puerto Rico Bottlers ("CC1"), as follows:

## INTRODUCTION

1.　This is an action for trademark infringement, unfair competition, breach of contract, and certain violations of the Puerto Rico Civil Code. Through this action, Niagara seeks permanent injunctive relief and damages arising from CC1's continuing infringement of Niagara's marks and willful breach of a Settlement Agreement executed by the parties. Reduced to its bare essentials, in flagrant violation of Niagara's rights, CC1 adopted and continued to use a mark that is confusingly similar to Niagara's registered trademarks on competing products within Puerto Rico's commercial demarcation. Accordingly, because CC1 failed to honor its obligations under the Settlement Agreement and could likely continue to infringe on Niagara's trademark, Niagara seeks the Court's

intervention to halt CC1's unlawful practices once and for all.

## THE PARTIES, JURISDICTION & VENUE

2. Plaintiff, Niagara, is a limited liability company organized and existing under the laws of the State of Delaware. It is registered with the State of Delaware's Department of State bearing registration number 5548641. Its headquarters are located at 2560 East Philadelphia Street, Ontario, CA 91761.

3. Defendant, CC1, upon information and belief, is a limited partnership organized and existing pursuant to the laws of the State of Florida. It is registered with the State of Florida's Department of State bearing FEI/EIN number 65-0602510. Its principal place of business is located in the Municipality of Bayamón in Puerto Rico. Its mailing address is listed as P.O. Box 51985 Toa Baja, PR 00950.

4. This Court has federal jurisdiction over the subject matter of this action pursuant to Section 39 of the Lanham Act, 15 U.S.C. 1121, 28 U.S.C. §§ 1331 and 1338(a) for the claims arising out of the violations of Sections 32 and 43(a) of the Lanham Act.

5. This Court likewise has jurisdiction over the parties and the subject matter because complete diversity of citizenship exists between the parties under 18 U.S.C. § 1332(a) and (c). The matter in controversy exceeds the sum of $75,000.00, exclusive of interests and costs. 28 U.S.C. § 1332(a)(1). Accordingly, the Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

6. Venue lies in this District since: (i) CC1's distribution center and administrative building are located in the Municipality of Bayamón in Puerto Rico; (ii) CC1's has advertised, promoted, and sold products bearing the infringing mark in this judicial district; and (iii) the causes of action asserted in this Complaint arise out of CC1's conduct in this judicial district.

**FACTS COMMON TO ALL CLAIMS**

*Niagara's Marks*

7. Founded in 1963, Niagara is the largest family-owned bottled water company in the United States. It manufactures and supplies a diverse selection of beverage products, including purified, sparking, and pH balanced water, as well as vitamin enhanced waters, and sports drinks.

8. From its inception, Niagara has been socially committed to not only meeting high quality standards, but to steadfastly drive and maintain ecological sustainability efforts through packaging innovation and engineering advancements. To achieve this goal, Niagara has devoted substantial resources to produce a state-of-the-art engineered bottle that reduces the amount of plastic contained therein by over 60 percent. Not only does this allow for each bottle to be lightweight, but recyclable as well. As a result, this enables Niagara to transport more water per truck load, use less plastic per bottle, and consume less energy in its production, which directly translates to much less carbon footprint.

9. Since 2010, Niagara has manufactured, advertised, marketed, promoted, distributed, and sold drinking water in its innovative bottles by using the **Eco-Air Bottle** trademark. Also, since 2013 Niagara has used the **Eco-Air Package** trademark (together with the Eco-Air trademark, the "**Eco-Air Marks**") to market the packaging of its bottled water cases, which are 100% recyclable. The Eco-Air Marks, conspicuously affixed to Niagara's products, serve to educate the customers on the environmental advantages associated with purchasing the same.

10. Niagara is the owner of federal trademark registrations number 3966725 and 4607169 issued by the United States Patent and Trademark Office ("USPTO") on May

24, 2011 and on September 16, 2014, respectively, for the **Eco-Air Bottle** word mark in International Class 32, for "drinking water, purified bottled drinking water" and for "water beverages; Plastic bottles sold as an integral component of bottled water and water beverages." Copies of the Certificates of Registration for the **Eco-Air Bottle** word mark are attached as **Exhibit A** and **B**.

11. An affidavit pursuant to Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058 and 1065 has been filed and, as such, registration number 3966725 is uncontestable and gives rise to presumptions in favor of Niagara with respect to validity, ownership, and exclusive rights to use the **Eco-Air Bottle** mark throughout the United States.

12. Niagara is also the owner of registration number 4508104, issued by the USPTO on April 1, 2014 for the **Eco-Air Package** word mark in International Class 16, for "shrink-wrapped plastic packaging and cardboard trays and boxes for packing bottled water beverages." A copy of the Certificate of Registration for the **Eco-Air Package** word mark is attached as **Exhibit C**.

13. Niagara also owns common law rights in the following trademarks, which it has used in interstate commerce since the year 2010 in connection with the advertising, marketing, promotion, distribution, and sale of its drinking water products (the "**Composite Marks**"):






14. The **Composite Marks** consist of the **Eco-Air Bottle** or the **Eco-Air Package** word mark depicted in color green, whereas the phrase "100% Recyclable" is reproduced underneath in color blue. The word marks are placed inside a white circle with a green outline and one prominent green leaf concavely positioned on the left-hand side of the circle with three incrementally smaller leaves placed under it (the **Composite Marks** and the **Eco-Air Marks** hereinafter collectively referred to as "**Niagara's Marks**").

### *CC1's Misappropriation of Niagara's Marks*

15. Upon information and belief, CC1 is engaged in the manufacture, distribution, promotion, and sale of beverage products in Puerto Rico, including bottled water marketed and sold under the Nikini trademark.

16. In 2016, Niagara discovered that, in an attempt to capitalize on the social and environmental appeal garnered by **Niagara's Marks**, CC1 had begun selling in Puerto Rico and St. Thomas, U.S.V.I., Nikini water bottles bearing a mark confusingly similar to **Niagara's Marks**, as depicted below (hereinafter "CC1 Mark" or the "Infringing Mark"):

 

17.     As shown by the images above, CC1 coined the mark "**New Eco-Earth Bottles**", which is confusingly similar to Niagara's **Eco-Air Marks** in commercial impression and also phonetically.  Further, CC1 adopted a design whose dominant features and overall appearance are practically identical to the **Composite Marks** inasmuch as the confusingly similar mark is also placed inside a white circle with half of the circle outlined in color blue with a green leaf concavely positioned at the bottom of the circle.

18.     As Niagara's competitor, CC1 offers its Nikini products to the same consumers as Niagara.  The **Infringing Mark** adds an extra layer of dubiety to **Niagara's Marks** since both brands, Niagara and Nikini, are: (1) known in commerce for selling bottled water; (2) both offer their goods in the same channels of trade; (3) both brand names start with the syllable "Ni"; and (4) their trade colors are predominantly blue and white.

19.     **Niagara's Marks** were used in interstate commerce extensively and continuously before CC1 began use of the **Infringing Mark**.

20.     CC1 and the Nikini products are not associated, affiliated, or otherwise connected with Niagara, or licensed, authorized, sponsored, endorsed, or approved by

Niagara in any way.

21. CC1's use of the **Infringing Mark** would mislead and deceive consumers into believing that Nikini's products are produced, authorized, licensed by or originated from Niagara.

### *The 2016 Settlement Agreement*

22. Upon learning about CC1's use of the **Infringing Mark**, Niagara objected to it through an amicable initial infringement letter dated March 29, 2016, where it demanded that CC1 cease and desist from continuing infringing its marks. **Exhibit D**.

23. Thereafter, the parties settled the matter without litigation through a Settlement Agreement effective January 3, 2017 (the "Settlement Agreement" or "Agreement"). **Exhibit E.**

24. In the Settlement Agreement, CC1 acknowledged not only Niagara's substantial and continuous use of **Niagara's Marks** since as early as 2010, but also the goodwill and reputation gained by **Niagara's Marks** in connection with bottled water.

25. Consequently, as part of the Settlement Agreement, CC1, pursuant to Section 1.1 and 1.2 obliged itself

> 1.1 to *refrain* now and *in the future* from using, adopting or registering, whether as trademarks, service marks, corporate names, trade names, product names, fictitious business names, business names, URLs, handles or social media account names, usernames, metatags, Internet keywords, email addresses, domain names, or other designations consisting of or incorporating the Niagara Marks, or any mark confusingly similar thereto[.] *See **Id***. at 3. (emphasis supplied)
>
> 1.2 to *refrain* now and *in the future* from using, adopting or registering, whether as trademarks, service marks, corporate names, trade names, product names, fictitious business names, business names, URLs, handles or social media account names, usernames, metatags, Internet keywords, email addresses, domain names, or other designations consisting of or incorporating the CC1, or any mark

7

> confusingly similar thereto except as expressly provided for in this Agreement[.] ***Id.*** (emphasis supplied).

26. Equally important, under Section 1.3 of the Agreement, CC1 also bound itself

> 1.3 to sell off or dispose of any and all Existing Inventory using the CC1 Marks by, and including, ***October 31, 2016.*** "Existing Inventory" as used herein shall mean all products produced, sold or offered for sale in connection with the CC1 Marks already in CC1's possession, custody or control as of the Effective Date of this Agreement. ***For clarification, under no circumstance may CC1 produce or make, or cause to be produced or made, any products with the CC1 Marks that are not Existing Inventory. After the phase-out period discussed herein, all use of the CC1 Marks as [sic] shall cease, pursuant to the terms set forth herein***[.] ***Id.*** (emphasis supplied).

### *CC1's Willful Wrongdoing After the Execution of the Settlement Agreement*

27. In or around June 2017, that is to five (5) months *after* the Settlement Agreement's effective date of January 3, 2017 and eight (8) months *after* the phase-out date of October 31, 2016 contemplated therein, Niagara learned that, notwithstanding the obligations assumed under the Settlement Agreement, CC1 had continued to manufacture, produce, distribute, and offer for sale in Puerto Rico Nikini products bearing the **Infringing Mark**.

28. As a result, on July 5, 2017 Niagara sent a letter to CC1 reminding it that refraining from future infringement of **Niagara's Mark**s after the phase out date of October 31, 2016 was a *sine qua non* requirement, the non-compliance of which constitutes a material breach of the Agreement. Niagara also demanded that CC1 immediately cease and desist from continuing its deliberate infringement of **Niagara's Marks** within (14) fourteen days of the request, to expire on July 19, 2017 or it would be

forced to seek legal action. **Exhibit F.**

29.     CC1 responded to Niagara's letter on July 24, 2017 dismissively, stating that the products Niagara referred to constituted "Existing Inventory" as defined in the Settlement Agreement inasmuch as they were purportedly manufactured *prior* to the Settlement Agreement's phase-out date of October 31, 2016.  Also, and in complete disregard for its voluntarily acquiesced obligations under Section 1.3 the Agreement, *supra*, it rejected having any affirmative duty "to recall from the market place or require its distributors, wholesalers, resellers, retailer and other vendors to cease and desist sales of any products bearing the CC1 marks." **Exhibit G,** ¶ 2 at 1.

30.     Notwithstanding the representations made in its letter of July 24, 2017, the fact is that CC1 continued with the production and sale of Nikini products bearing the **Infringing Mark** after the phase out date of October 31, 2016 and even after the effective date of the Settlement Agreement.

31.     Meanwhile, on November 30, 2017, CC1, upon request, informed Niagara that the labels bearing the **Infringing Mark** were allegedly last run on March 24, 2017, that is, almost five (5) months after the phase out date of October 31, 2016 and almost three (3) months after the effective date of the Settlement Agreement. **Exhibit H** at 3.

32.     Despite CC1's obligations under the Settlement Agreement, it continued to manufacture, distribute, sell, and advertise the infringing products in Puerto Rico —and possibly other jurisdictions— even *after* the Agreement's phase out date of October 31, 2016.

33.     Upon information and belief, after October 31, 2016 CC1 manufactured, distributed, and sold at least 756,220 cases of Nikini bottled water bearing the **Infringing Mark**. *Id.* at 1.

34. By and through its actions as described above, CC1 knowingly, intentionally, deliberately, and in bad faith continued to infringe **Niagara's Marks** in conscious disregard of Niagara's intellectual property rights, as well as its contractual obligations as unequivocally set forth in the Settlement Agreement.

35. Although in response to Niagara's letter of July 24, 2017 CC1 has represented to Niagara that it ceased use of the **Infringing Mark**, CC1's intentions remain doubtful in view of its prior conduct of blatantly breaching the Settlement Agreement and continuing to infringe **Niagara's Marks**.

## CLAIMS FOR RELIEF

### A. Cause of Action No. 1: Trademark Infringement Under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

36. Niagara adopts and incorporates by reference pursuant to Fed.R.Civ.P. 10(c) all of the foregoing paragraphs as if copied here *in extenso*.

37. Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), in pertinent, states that

   (1) Any person who shall, without the consent of the registrant—

   (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

   (b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

   …

38. Long after the adoption and use by Niagara of the federally registered **Eco-Air Marks**, CC1 began to use a confusingly similar mark in connection with the sale, offering, distribution, and advertising of its competing products.

39. CC1 had either actual or constructive knowledge of Niagara's ownership of rights in its federally registered **Eco-Air Marks** prior to its adoption and use of the **Infringing Mark**.

40. CC1's use of the **Infringing Mark** is likely to cause confusion, mistake, and deceit in the minds of the public by leading the public to believe that Niagara has approved, sponsored or otherwise associated itself with CC1's infringing products.

41. CC1's acts constitute trademark infringement in violation of Section 32 of the Lanham Act. 15 U.S.C. § 1114.

42. The foregoing acts of infringement have been deliberate, willful, and wanton to the extent they continued even after the execution of the Settlement Agreement.

43. As a proximate result of CC1's actions, Niagara has suffered and will continue to suffer great damage to its business, goodwill, reputation, profits, and strength of its marks, in an amount to be determined at trial.

44. Further, the injury to Niagara is and continues to be ongoing and irreparable. An award for monetary damages alone cannot fully compensate Niagara for its injuries and Niagara lacks an adequate remedy at law.

45. Notwithstanding CC1's purported voluntary cessation of its infringing activity, there is a substantial possibility that CC1 could resume use of the **Infringing Mark**, based on its admitted failure to comply with the obligations assumed under the Settlement Agreement. Niagara is therefore entitled to a permanent injunction enjoining infringement of its **Eco-Air Marks.**

46. Niagara is also entitled to all other remedies available under the Lanham Act, including, but not limited to, an accounting and disgorgement of the profits made by CC1 on sales of its Nikini infringing products (believed to exceed $1,000,000), as well as recovery of costs of this action.

47. Given the fact that CC1's conduct was undertaken willfully and deliberately, Niagara is also entitled to recover reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

### B. Cause of Action No. 2: Federal Unfair Competition, 15 U.S.C. § 1125(a).

48. Niagara adopts and incorporates by reference pursuant to Fed.R.Civ.P. 10(c) all of the foregoing paragraphs as if copied here *in extenso*.

49. Long after the adoption and use by Niagara of its distinctive **Composite Marks**, CC1 began to use the **Infringing Mark** in connection with the sale, offering, distribution and advertising of its competing products.

50. As a result of its continued use in interstate commerce since 2010, the **Composite Marks** have become associated with Niagara and thus exclusively identify its business, products, and services.

51. The overall commercial impression of the **Infringing Mark** is practically identical to Niagara's **Composite Marks.**

52. The foregoing acts and conduct by CC1 is likely to cause confusion, deception, and mistake by creating the false and misleading impression that the Nikini products are manufactured or distributed by Niagara, or are associated or connected with Niagara, or have the sponsorship, endorsement or approval of Niagara, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Niagara has no adequate remedy at law for this injury.

53. CC1's unauthorized and tortious conduct has deprived Niagara (and, if resumed, will continue to deprive Niagara) of the ability to control the consumer's perception of its products offered under the **Composite Marks**, placing Niagara's reputation and goodwill in the hands of CC1.

54. The foregoing acts of infringement have been deliberate, willful, and wanton to the extent they continued even after the execution of the Settlement Agreement.

55. Notwithstanding CC1's purported voluntary cessation of its infringing activity, there is a substantial possibility that CC1 could resume use of the **Infringing Mark**, based on its admitted failure to comply with the obligations assumed under the Settlement Agreement.

56. CC1's conduct warrants, at minimum, permanent injunctive relief enjoining infringement of Niagara's **Composite Marks.**

### C. Cause of Action No. 3: CC1's Breach of the Settlement Agreement.

57. Niagara adopts and incorporates by reference pursuant to Fed.R.Civ.P. 10(c) all of the foregoing paragraphs as if copied here *in extenso*.

58. As specified above, CC1 contractually agreed that it would not manufacture, distribute, sell and/or advertise any of its infringing products after the Settlement Agreement's phase-out date of October 31, 2016. *See* **Exhibit E,** §§ 1.1 - 1.3 at 1.

59. CC1 has materially breached the Settlement Agreement by manufacturing and distributing since October 31, 2016 at least 756,220 cases of Nikini products in Puerto Rico —and presumably in other jurisdictions— bearing the **Infringing Mark**.

60. CC1's breach of the Settlement Agreement by and through the means set forth above was willful, intentional, and deliberate.

61. Niagara has, at all times, upheld the terms of the Settlement Agreement.

62. Niagara has been damaged as a consequence of CC1's breach of the Settlement Agreement.

63. From CC1's breach stems Niagara's right to seek recovery of the profits derived by CC1 as a result of its use of the **Infringing Mark**. Recovery of reasonable attorneys' fees, costs and expenses is likewise supported by Section 3.5 and 3.6 of the Settlement Agreement, which provide as follows:

> 3.5. Each Party shall bear its own attorney's fees, costs and expenses in relation to this Agreement. However, if any term or terms of this Agreement are required to be enforced or construed, the other Party may seek relief from a court to enforce and/or interpret the terms of this Agreement. In the event such relief is sought, reasonable attorney's fees, costs and expenses shall be awarded to the Party that successfully obtains, or opposes the relief requested.
>
> 3.6 CC1 acknowledges that a breach or threatened breach by CC1 of any of its obligations of this Agreement would give rise to irreparable harm to Niagara for which monetary relief would not be an adequate remedy. CC1 therefore agrees that in the event of a breach or threatened breach by CC1 of any of such obligations, representations or warranties, Niagara shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to take action in pursuit of equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction. (without any requirement to post bond). *See* **Exhibit E** at 4-5.

### D. Cause of Action No. 4: CC1's Breach of the Covenant of Good Faith and Fair Dealings.

64. Niagara adopts and incorporates by reference pursuant to Fed.R.Civ.P. 10(c) all of the foregoing paragraphs as if copied here *in extenso*.

65. Puerto Rico law implies a covenant of good faith and fair dealings in all contracts entered into by the parties when Puerto Rico law is applicable to any dispute arising thereunder. 31 P.R. Law. Ann. §§ 2994 and 3375.

66. CC1's purposeful material breach of the Settlement Agreement by manufacturing, distributing, selling, and advertising products bearing the **Infringing Mark** in Puerto Rico —and possibly in other jurisdictions— after the phase-out date of October 31, 2016 (and after the Settlement Agreement's effective date) constitutes a breach of the covenants of good faith and fair dealings.

67. CC1's lassitude regarding the whereabouts of Nikini's infringing products and lack of action as to its recall constitutes bad faith as it diametrically contradicts its obligations under the Settlement Agreement, infringes upon **Niagara's Marks**, and impairs its goodwill and reputation. Such actions by CC1 did not involve an exercise of discretion, but rather a conscious material breach of the Settlement Agreement and, as such, it is actionable under Puerto Rico law.

**WHEREFORE,** Niagara prays:

   a. For a judgment that:
       i. CC1 has violated Section 32 of the Lanham Act, 15 U.S.C. § 1114;
       ii. CC1 has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);
       iii. CC1 willfully and deliberately breached the Settlement Agreement validly executed with Niagara;
       iv. CC1 breached the covenant of good faith and fair dealings in the execution of the Settlement Agreement validly executed with Niagara;
   b. That a permanent injunction be issued enjoining and restraining CCI and its officers, agents, servants, employees, attorneys, and all those

15

       in active concert or participation with it from:

     i. Using any reproduction or colorable imitation of the Niagara's Marks to identify any good or their packaging not authorized by Niagara;

     ii. Engaging in any course of conduct likely to cause confusion, deception or mistake, or to injure Niagara's business reputation;

     iii. Further infringing the Niagara Marks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any products or their packages not authorized by Niagara, bearing any simulation, iteration, reproduction, copy or colorable imitation of the Niagara Marks;

     iv. Using any simulation, iteration, reproduction, copy or colorable imitation of the Niagara Marks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized products or their packaging in such fashion as to relate or tend to relate or connect, such products in any way to Niagara, or to any goods sold, manufactured, sponsored or approved by, or connected with Niagara;

     v. Secreting, destroying, altering, removing, or otherwise dealing with the unauthorized products or any books or records which contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, renting, or displaying of all unauthorized products which infringe the Niagara Mark; and

     vi. Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (i.) – (vi.).

c. For CC1 to be compelled to account to Niagara for any and all profits derived by CC1 from the sale or distribution of the products bearing the **Infringing Mark** after October 31, 2016;

d. CC1 be required to disgorge to Niagara the profits derived as a result of its use of the **Infringing Mark** after October 31, 2016, in an amount to be determined at trial but to be believed to exceed $1,000,000;

e. CC1 be required to pay to Niagara the costs and reasonable attorneys' fees incurred by the latter in this action pursuant to 15 U.S.C. § 1117 in view of CC1's willful and deliberate conduct; and

f. For any other remedy resulting from CC1's breach of the Settlement Agreement and of the covenant of good faith and fair dealings under Puerto Rico's Civil Code.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, on this 26th of June, 2018.

**ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, PSC**
*Counsel for Niagara Bottling, LLC*
P.O. Box 70294
San Juan, PR 00936-8294
Tel.: 787.756.9000/Fax: 787.756.9010

*/s/ Shylene De Jesús*
SHYLENE DE JESUS
U.S.D.C. (D.P.R.) No. 219704
sdejesus@amgprlaw.com

*/s/ Sarika J. Angulo*
SARIKA J. ANGULO
U.S.D.C. (D.P.R.) No. 230502
sangulo@amgprlaw.com